Next case this morning is Angela Borrell v. Bloomsburg University Ms. Tudy Good morning, your honor. May it please the court, may I please reserve one minute for rebuttal? Granted. I represent Geisinger Medical Center and Art Richer. The district court erred in its application of LUGAR. LUGAR requires both a state rule and a state actor for the high standard of constitutional liability to attach to private parties. Appellants request that this court reverse summary judgment that was granted in favor of Ms. Borrell because as a matter of law there was no state rule in this case, the joint employment between Mr. Richer and Bloomsburg University as a matter of law is insufficient to meet the LUGAR second prong of state actor, and Geisinger entering into a contract with Bloomsburg University is likewise insufficient as a matter of law to meet the LUGAR second factor. The test that this court has used is looking at whether or not Geisinger and Richer's conduct is fairly attributable to the state. And with respect to it, the first test of there being a state rule. In American Manufacturers Mutual Insurance Company v. Sullivan, there the Supreme Court held that there was a state rule. The state rule was a Pennsylvania workers' compensation statute that made it very clear. I'm not, Your Honor, suggesting that the only rule would be that that is a statute, but it is that kind of same high standard. In Edmondson, we see preemptory challenges being held to constitute state action. But in that case, there was rules of civil procedure that were The district court here, where it erred, is it held that because Bloomsburg University allowed Geisinger Medical Center, which had a private policy that applied to all of its nurses, that that private policy was somehow converted into becoming state action or state rule because Bloomsburg acquiesced or allowed Geisinger Medical Center to have its rules apply during the program. This is the same issue that arose in the NCAA Tarkanian case. There, the NCAA was held to be a private party, and it recommended sanctions for the basketball coach. The University of Nevada adopted the sanctions that were granted. Despite that And so we would suggest here, Your Honor, that there is... Wasn't that a subsequent action by Nevada to adopt the NCAA's recommendations? Yes, Your Honor. All right, but here, it's a little different. I mean, you've got a joint employee, correct? Yes, Your Honor. And you've got a letter, a joint letter. You know, it does seem like Bloomsburg has its hands on this dismissal, right? Your Honor, I would disagree. If you look at the collaboration agreement and how this was originally set forward, the plan was such that Bloomsburg would be in charge during the academic portion of the program. But in the agreement, they made clear that Geisinger shall have sole authority and control over all aspects of the clinical provided to the students. Right, which raises the question of, if that's true, why didn't your client, Richard, just like Geisinger, require from time to time drug tests, you failed to take one, and just like the other four people we fired, you're fired. Your Honor... That's not what happened. Your Honor, the reason that it was on joint stationary, he was the program director, but what this court has taught in Lesko is that this court rejected the argument that automatically, just because the foster parents there were state employees, that they're automatically then the state. In Polk, the Supreme Court rejected that a public defender who was solely a state employee suddenly becomes a state actor. This court has consistently done a very careful factual analysis about what hat the person is wearing. Here, where Mr. Richard was consulting with Brian Lieberman, the human resources representative for Geisinger Medical Center, and with the executive vice president of Geisinger Medical Center to understand how Geisinger Medical Center carries forth this policy as it did with the other four nurses, he was wearing his Geisinger Medical Center hat. He did sign the letter, and he signed it on behalf of Geisinger. Dr. Ficca signed it on behalf of Bloomsburg. All right, so you're saying maybe that letter helps you because if he were wearing both hats, there would have been no need for Ficca to sign on behalf of Bloomsburg. Yes, Your Honor. And so really the case, in your view, comes down to not his status as a, quote, joint employee, but rather his behavior at the time the decision of fire was made. Yes, Your Honor. And that has to be the careful analysis that has always been followed, because this court has not drawn lines. There are no bright lines in this area. It is very messy, and it's very fact-intensive. And that's what the court has repeated, is that you have to look at how the person is acting. Did the district court agree with your analytical paradigm? No, Your Honor. So that analysis never occurred then about what hat he was wearing? Correct, Your Honor. It was just status. He's a joint employee. Look at the letter. State actor. Yes, Your Honor. That was exactly what was concluded. And that's the opposite of, I guess, what happened in the similar case out of the same district, the Weil case. Yes, Your Honor. And Weil, which this court has said is a very well-reasoned opinion, the court looked at – because the gentleman there, Mr. Greenberg, was wearing – had two hats as well. He was at Lock Haven University as the program director. He also had a private entity of which he was the president and CEO. And so in that case, the court said, we have to look at why he's acting, what he's doing, what's his motivation, and what's his authority. And because this court has consistently held that there is a very high standard for attaching constitutional liability, we have to look at the facts and where the authority is coming from. And here, the testimony was undisputed at summary judgment in favor of Geisinger Medical Center. Dr. Ficka had said, basically, her hands were tied because the issue was one that was happening within the clinical training program, where under the contract, they had to follow the contract and allow Geisinger Medical Center to make the decision. Because in the contract, it said that it had the authority to exclude the registered nurses from being able to treat patients. Let me ask you this question. Let's assume that we find that there is state action here. And you've also posited the defense of qualified immunity. As a private actor, when a private actor is deemed a state actor, can you claim qualified immunity under those circumstances? Your Honor, we had pled good faith immunity because we understood that Mr. Richard was a private actor. And so that was what we had argued at summary judgment. And then the court had opined that instead of that, it would defer a ruling on the issue of qualified immunity, which was also pled in our amended answer. The issue of qualified immunity, at a minimum, should have been a trial issue. Once the court held that he was a state actor, which we dispute. But once that was held, then the jury should have been able to determine whether or not qualified immunity applied. Because you can raise that even through trial. Yet Mr. Richard did not have that defense. He was stripped of both good faith immunity and qualified immunity. Okay, I thank you for answering that question. The other issue that I wanted to address was in – oh, I'm sorry, I'm out of time. Thank you. We're here on rebuttal, Ms. Tootie. Thank you. Mr. Knorr. May it please the Court, my name is John Knorr. I'm with the Attorney General's Office, and I represent Dr. Michelle Ficke of Bloomsburg University, who is the other appellant. If I may, I would also like to reserve one minute for rebuttal. Okay. We usually only allow one rebuttal, but since you only asked for a minute, I'll give it to you. Thank you. Your Honor, I'll be happy to answer questions about any of the issues in all of these appeals. But my intention is to focus on the due process issue, that is, whether Ms. Burrell had a protective property interest at all. And if she did, did she get the process that was due? As you know, property interests are not created by the Constitution, and they are not just pulled out of the ether. They have to be created and defined by state law. And in a case like this, it is up to the plaintiff to establish exactly where in state law this asserted property interest is rooted. It's been recognized, has it not, Mr. Knorr, that graduate students have a right to continue in their program? They have some right. I'm sorry. I didn't hear you. Graduate students have a right to continue in their program? No. There's no right? No. They don't have a contractual right? Where does this come from is our question. So you pay tens of thousands of dollars to a university, and they can just throw you out, and you have no rights? I wouldn't say they have no right. They may have a breach of contract action. That's what I asked. They want the tuition back. All right. So you're saying they have a contractual right but not a property right? That's correct. That's correct. For a contractual right to rise to the level of a protected property interest, this Court has said repeatedly there has to be an explicit for-cause provision in the contract, and that's never been pointed at. That doesn't exist in this case. Ms. Burrell has pointed to no law, no regulation. Well, didn't Judge Caputo find various district court decisions that found that there was a property right? Yes, he did. That's what the district court relied on. He relied on the old Ross case in the 1970s and the cases that follow it. They follow it, by the way, with no analysis whatsoever, no discussion. So back to Ross. Is there any Pennsylvania case on the question? Not to my knowledge, Your Honor. There is not. Is it sufficient that there were district court cases there interpreting Pennsylvania law or seemingly interpreting Pennsylvania law on the existence of a property right? In our view, the Ross case is both outdated and distinguishable. It's not entirely clear what the district court's analysis was based on at Ross. There seem to be kind of two strands. One is, well, there's a contract here. Well, fine. We have at least an implied contract here as well. But where is the for cause provision in our contract? And then the district court said, well, we're relying on statements of policy from the university. In that case, it was Penn State. Fine. We have statements of policy here as well. And not only do they not have a for cause provision, they seem to point explicitly in the other direction that at least as regards to Geisinger, Ms. Burrell had owned the status of an employee at will. So where in state law is this property interest coming from? And when we got to summary judgment and Ms. Burrell had failed to even attempt to identify a source, the case should have been under cell text. The case should have been over then and there. Was Burrell's dismissal academic? Yes, it was. How can you say that when we just heard Ms. Toody argue that this was a private hospital that has its own rules and regulations, not a state actor, that exercised its right to dismiss her for violating its rules? What's academic about that? It seems punitive. And it seems unrelated to her course of study at Bloomsburg. I know. It has a disciplinary feel to it, doesn't it? And that's what the district court really went on. Not just feel. You're fired is not you got a C on the test. Maybe I have too cramped a view of academic. Well, if she was no longer able to work at Geisinger Hospital, was she academically qualified to continue in the nurse anesthetist program? No, she was not. And if I may, Judge Hardiman, you do have too cramped a view of academic because the case law on this issue is unanimous, that when you have people who are, I guess you could call them quasi-employees, when they are in a course of study that involves a clinical program like this, or say student teaching, they have to demonstrate an ability to comprehend and to follow not just the book learning and not just their technical skills, but the workplace rules and the professional norms that govern their profession. And when they fail to do that, either because they mouth off to a supervisor or they have unacceptable personal hygiene, the courts have uniformly treated that as an academic matter. Why couldn't Burrell just participate in the nurse anesthetist program that Bloomsburg might establish with a different hospital? I mean, is she forever barred from becoming a nurse anesthetist or isn't it true that she's just unwanted at Geisinger and she would have to recover from this and start anew at another locale? Well, that's exactly correct. And I suppose in theory, if we had had arrangements with more than one employer, more than one health center, she could have tried to get in with a different employer. But the fact is, Geisinger is the only partner that we had in this program, and so that was the end of it. I see my time has expired. Are there any other questions? Thank you, Mr. Knorr. Thank you. Mr. Diller. Thank you, Ron. May it please the Court, my name is Barry Diller. I represent the appellee cross-appellant Angela Burrell. Mr. Diller, could we start with where we were with Ms. Toody in respect to the analytical framework of this case? Do you agree with her that the district court essentially held that because Richard was a joint employee, it necessarily followed that there was state action? I think that that was one of very many factors. All right, and do you agree, I assume you don't, but do you agree with Ms. Toody that we need to evaluate which hat Mr. Richard was wearing at the time that he decided that your client could not participate in the Geisinger? No, I don't. Okay. And before I tell you why I don't, I will tell you that at page 1491 of the appendix is the termination letter, and Ms. Toody said he is acting separately as Geisinger and Ficka is acting separately on Bloomsburg, but even Richard signs that letter as director, nurse anesthesia program. He doesn't sign it as Geisinger. The nurse anesthesia program is a joint collaborative program. Well, but he didn't, did he dismiss her from the program or did he fire her from Geisinger? The program. He dismissed her from the program? Yes. And you're saying that program is a state program? I'm saying, yes, it is, and it is a state program. So, yes, he was a joint employee. But he didn't fire her because she violated any Bloomsburg rules. He fired her for the same reason the other four Geisinger nurses who weren't part of this program were fired, correct? Yes. So that sounds a lot like a private hospital deploying its private discipline policy for its nurses. Incidentally, he applied it incorrectly, but you are correct. Of course, those other four nurses were not entitled to due process because they were not part of any collaborative program. There was no acting in concert with a state actor. But they were also, all of them were nurses practicing in a hospital where the danger of having a nurse or an employee trying to operate under the influence of drugs calls for an ability to immediately terminate that employee. And isn't Ms. Burrell in the same position as the other nurses that a hospital cannot tolerate having nurse employees who use drugs? Well, the answer is yes and no. It is, of course, a very serious concern. But the difference is this is not about whether she was or wasn't using drugs. And that is really truly another story. This is about whether she was or wasn't entitled to due process. Well, was she entitled? In order to determine if she was using drugs, the hospital had the right, and it's in the joint program, acknowledging that they're following the hospital policy to test her for drugs. Now, when you're testing someone for drugs, you don't want to wait until the next day or the next week. You need to do it right now. And if someone says, whoa, I will not be tested, that is certainly an indication that the reason she doesn't want to be tested is to get a positive test. Well, it might be. In this particular case, in fact, under all of the facts in the light most favorable to Geisinger, she actually had not violated the drug and alcohol policy, and she had not violated the prohibitions of the policy nor the drug testing aspects of the policy. Because if one reads the actual policy, which none of the defendants actually did, it prohibits use or being under the influence of drugs at work. And the only information that Geisinger had, which was false, but they had information that she had used drugs three months earlier on a weekend. Well, they had other information about her behavior, didn't they, or even her appearance. And all of that's immaterial, isn't it? I mean, let's assume that, you know, her friends set her up. The hospital still has a right to ask its nurses, even if erroneous, to take a drug test. That's the policy, right? Well, it's actually not the policy. It's what the policy should have read, but it's not what the policy did read. The policy does not allow them to request or require drug testing? It allows them to require drug testing in order to assure compliance with the prohibitions, and the prohibitions are defined very specifically about using or being in possession of drugs at work. All right, but if they were being under the influence. Yes, or being under the influence. Okay, and couldn't her appearance give them the belief that based on past information that she had been using drugs and could perhaps be under the influence? Yes, and that's true, except that when they said that this was based on changes in her appearance and demeanor, they acknowledged that was false, that that was a made-up story. You mean, looking at her that day, they knew it was false? No. Why? Well, they said the only – we noticed three months earlier one day she came in looking tired and her nails were chipped. Her nail polish was chipped. They said we did nothing about her appearance, nothing about her demeanor, ever made us think she shouldn't be in with patients administering anesthesia, and, in fact, on the day they requested the drug test, she was in an operating room administering anesthesia. They had received this report the Friday before, and then on Monday when they asked for the test, they asked for the test around 11 a.m. She had been in an operating room since 6 a.m. administering anesthesia. All of the witnesses said we never would have allowed her to go in and administer anesthesia if we thought she were at all under the influence. They also said, incidentally, we wouldn't have let her drive home after this if we thought she were under the influence. All right. Well, you're arguing very well the merits of, you know, whether they invoked their policy correctly and implemented it correctly, but none of that really sheds any light, I don't think, on whether Geisinger is a state or Richard is a state actor. That's correct. I'd like to address that if I can. Yeah, so you're saying it's not the conduct, it's the status. That's what I'm really wrestling with in this case. If it's the status, you're a clear winner because Richard was defined, and they admit that he was a joint employee. But if it's the conduct, if it's the hat he was wearing, then you might have a problem, right, because he had a right to implement the hospital's sanction for those who refused to take drug tests. Well, if we talk about the status, he defines it as director of the nurse anesthesia program, not Geisinger. No, no, at the time he fired her, you're saying he identified himself as director of the program. Yes, and that's 1491. And that program is a joint program. It's a joint program under an agreement called a collaboration agreement, which is pretty clear about acting in concert. But he did not invoke the Bloomsburg handbook or anything like that. He invoked Geisinger's own private policy, which is the same policy that got the other four nurses that weren't part of this program fired. Yes, he invoked it in saying you should have taken the drug test. They also included in the termination letter the pages from the Bloomsburg University Department of Nursing student handbook, which have due process procedures. They included that in the termination letter. And Burrell was an employee of the hospital before she entered the program. Yes. So one of the challenging, I think, parts of your argument is that you're asking us to ratify a decision of a district court that inhibits the ability of a hospital to punish one of its employees if that employee later enrolls in a curricular course. Well, you know, her status changed. She had been an employee. Now she's a student in this joint program. So students can't be drug tested at the hospital. It seems a little upside down, doesn't it? Someone who works for Geisinger for 30 years as a nurse can be drug tested, but somebody who works there for a couple years then becomes a student can't be drug tested. Well, she was drug tested. She was drug tested twice when she was a student. Right. When she was asked to be drug tested, she refused. Well, she refused during that time when it was clear that something was fishy. Why didn't she just take the drug test? Well, actually, she said, I will take the drug test if you test everybody. But she knew that even when she takes the drug test and it's negative, that will be on her record. That looks pretty – I don't understand that. That looks pretty good on a record, doesn't it? Well, what it looks like is there was some suspicion about you, and so future employers are going to say, okay, you came out negative, but someone suspected something about you. There must be something there. I don't find that very convincing. Well, and I'm sorry that you don't, Judge Roth. What else can you say? I found it a little convincing. Well, I'm glad that you do, Judge Hartigan. No, I mean, it could be viewed either way depending upon who's looking at the record. But she said, test everybody, test me and everybody else. Well, I'm not sure she has a right to dictate that to the hospital, right? That's a little bit insubordinate, one might say, or I don't know. I guess the other way to say it is she's crying out for equal treatment and fairness, and she thinks maybe some of the other people are on drugs and they're not testing them, I guess. She thinks that I'm being singled out for some reason. I know they're lying, but I don't know why. And that's what happened. But there's so much more about the acting in concert. There were other joint employees. Even during the time when they were in the clinical aspect at Geisinger, the students are paying tuition to the university. All of that is clearly in your favor, but then the question becomes, do we separate out the decision to fire? And I guess your answer to that is you don't want us to do that, but even if we did, you're still making the point, look at the letter, he's self-identifying at the time of firing as someone who is wearing both hats. That's right. If he's wearing both hats, why does Ficka sign the letter? Because she's chair of the nursing department and they got her and others involved. But she is the state actor, right? Well, she certainly is a state actor. I won't say she's the state actor. But she's always a state actor in this matter, right? Also, at 1506 and 1507 of the appendix, I'll just mention, when Richard sends notification to the certifying agency, again, he identifies himself as the director of that joint Geisinger-Bloomsburg University program. Mr. Diller, if you would, would you address the argument that Mr. Knorr made, whether or not there is a Pennsylvania decision that says your client has a property right? And what is that decision? Well, in 2014, certainly the Gotti decision, G-A-T-I, in the Superior Court, was very clear that status as a graduate student is a property interest. And I'll note that in the Superior Court, one of the three judges on the panel was Judge Wecht, now in the Pennsylvania Supreme Court. So while neither Richard Geisinger could never be entitled to qualified immunity, and Richard, because he was in this joint- Why could Geisinger not be entitled to qualified immunity? Because Geisinger stands in the stead of the equivalent of a municipality, which would never be entitled to qualified immunity. Just like there's no vicarious liability, that's why. But Bloomsburg is a state entity, is it not? It is. So if your first argument is that Geisinger is liable here because it's a joint state actor, how can you extricate it as something else when it comes time to evaluate qualified immunity? Because it is just like municipalities act through their employees, Geisinger, as an organization, acts through its employees. It is, and if I wanted to prove a policy in custom, a Monell policy in custom, I would have to do that, if that were the theory of the case, for a non-state actor, acting under the color of state law, which is an organization. Let me ask you a little more straightforwardly. Are you saying that Richer is a state actor for purposes of liability, but he's not a state actor for purposes of qualified immunity? No. Well, yes, I take that back, yes, because he was also a Geisinger employee. Incidentally, unqualified immunity, so maybe we can forestall that. Qualified immunity for Richer was waived. While it was pled in the answer, it was not pursued until subsequent to summary judgment being granted against him. While normally qualified immunity could be a trial issue, depending on how the facts go. The jury can never decide if the law was clearly established. But once liability is established, it's too late. So whether he was or wasn't potentially entitled to qualified immunity, it's too late. Let's go back to your answer about Gotti. Isn't the Gotti decision undermined by the decision in Tran that says that a student at a public university does not have a contract right? No, because property rights, I mean, the U.S. Supreme Court, like in Perry v. Sinderman, has said it's based on expectations, including of previous events. So just as Judge Hardiman said earlier, if you pay your tuition, you do your work, you know what has been expected in the past, that is an expectation which results in a property right under state law. And all of the cases, I disagree with Mr. Knorr, that Ross is an old case, so it doesn't count, and that the several other district court cases don't count. They count. And I don't believe that Tran has any effect on that. Incidentally, the Bloomsburg University handbook with the due process procedures says that the procedures apply to clinical agency rules as well, and Geisinger was considered a clinical agency. But they didn't fire her for violating the handbook. They fired her for violating Geisinger's drug and alcohol policy. That's true. But all of these writings provide an expectation to the graduate student, including the university writings, and incidentally the joint nurse anesthesia program administrative manual, which was marked confidential throughout the discovery process, but had a due process procedure that was also denied. I am sorry I did not have time to reach the cross appeal, which I think is the most important issue. We'll consider that on the briefs. Thank you, Mr. Dill. Thank you, Your Honor. Ms. Toody, rebuttal? Yes, Your Honor. I would just ask this Court not to conflate the analysis. LUGAR requires both a state rule and state action. Why don't you go right to, I think, Mr. Diller's best argument, is he self-identified as director of the NAP in the letter firing Borrell. Yes, Your Honor. He did sign the letter as the program director, but the case law here, first of all, that's based on the false assumption that the nurse anesthesia program was somehow a state actor. Just because a contract is entered, Rendell Baker holds that you cannot have mere contracting with the state. Even where there, the school that was providing education to the maladjusted youth received 99% of its funding from the state in some years, 90% in others. It was not state action. Right, that's true about the program, but we were talking about the hat that he's wearing. Right. And the argument, as I understand it from Mr. Diller, is at the time Richer is firing her, he's wearing his joint employee hat and just look at how he identifies himself. He's telling us that he's wearing his joint employee hat, not his Geisinger hat. No, Your Honor. By being the program director under the collaboration agreement, he is necessarily still an employee of Geisinger Medical Center. By signing and saying I am the program director, that in no way negates the agreement that is said that during the clinical portion that that is solely Geisinger Medical Center's power and authority. And there would be no need for Dr. Ficca to then sign that agreement. So there's a conflation going on here of there somehow being joint action just because he happens to be a state employee. And that here, the policy, the people that he consulted with, Mr. Diller's argument about the policy not being applied, if you look at the policy, it specifically talks about human resources having to determine whether or not there's reasonable suspicion on a case-by-case basis. Here, that's why Mr. Lieberman from Geisinger Medical Center spent an hour with Ms. Burrell along with Mr. Richer. This was clearly the Geisinger Medical Center hat. And while he sent out that letter and was the program director, that in no way negates the function, the role, the policy, or the authority that was vested in him by Geisinger Medical Center. Thank you. Thank you, Ms. Toody. Do you have anything further, Mr. Noor? One point only, and that is that the Gotti case did not squarely resolve the property interest issue. In Gotti, the court didn't even find it necessary to resolve whether Pitt was a public or private institution. In the end, like the Supreme Court in Horowitz and like so many other of these cases, they just said, well, we don't really have to resolve any of that because the procedures that Pitt followed in that case would be sufficient to satisfy any demands of due process. And so while they mentioned the property interest issue and they mentioned Ross, they don't squarely resolve it. Thank you. Thank you, Mr. Noor. The court appreciates the excellent arguments and will take the matter under advisement.